JOHN E. GUNTER *v.* SHARP & DOHME, INC., ET AL.
[No. 49, April Term, 1930.]

*Decided June 24th, 1930.*

The cause was argued before BOND, C. J., PATTISON, URNER, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*James K. Cullen,* with whom were *Rowe & Cullen* on the brief, for the appellant.

*Walter L. Clark and Roszel C. Thomsen,* for the appellees.

SLOAN, J., delivered the opinion of the Court.

The appellant, John E. Gunter, was an employee of Sharp & Dohme, Inc., engaged in the mixing of bichloride and cyanide powders, and had been so engaged for three years preceding the disability for which he claims compensation. He is suffering from nephritis, or Bright's disease, which he contends is the result of an accidental injury, the accident alleged being the inhalation of the fumes or dust arising from bichloride of mercury and cyanide of potassium. The Accident Commission had made an award to the claimant, from which the employer and insurer appealed. At the trial on appeal the only issue was as to whether "the disability of the claimant" was "the result of an accidental injury arising out of and in the course of his employment." At the conclusion of the claimant's evidence the employer and insurer submitted two prayers for directed verdicts: (1) That there was no evidence in the case legally sufficient to prove the disability complained of was the result of "an accidental injury arising out of and in the course of his employment"; and, (2) that "it appears from the evidence offered on behalf of the claimant, which is uncontradicted, that his disability is the result of an occupation or industry disease and not of an accidental injury," both of which were granted and excepted to by the claimant.

If there was an "accidental injury," there is no dispute that it arose out of and in the course of his employment, and if so, it could not be withdrawn from the consideration of the jury, because of the provision of the statute that on appeals "the decision of the Commission shall be *prima facie* correct and the burden of proof shall be upon the party attacking the same." Code, art. 101, sec. 56; *Aetna Life Ins. Co. v. Bittinger,* 159 Md. 262.

The question in this case is whether the disability complained of, namely, nephritis or Bright's disease, is the result of an accidental personal injury (Code, art. 101, sec. 14), or

under the testimony is an occupational disease, for the compensation of which the Legislature has made no provision. If an occupational disease, there can be no compensation, the Accident Commission having no authority to write into the law objects of compensation for which the Legislature has not provided. On appeal "the court shall determine whether the commission has justly considered all the facts concerning injury, whether it has exceeded the powers granted it by the article, whether it has misconstrued the law and facts applicable in the case decided," with the right to either party to have submitted "to a jury any question of fact involved in such case." Section 56.

According to the testimony of the claimant, as read from the transcript of the record from the Accident Commission taken March 23, 1929, he was then fifty-one years of age; for three years he had been mixing bichloride and cyanide powders for Sharp & Dohme in Baltimore, and for three years before that he had been making other kinds of powders. In part he testified as follows: "Q. Just describe the room there and kind of work that you had been doing for the past three years. Everything surrounding your work? A. It was sometime in November—three years ago, that Mr. Dixon —he is our superintendent—asked me if I would take a job in the bichloride of mercury room and I thought it over and said I would. We had a suction fan and we worked along up until last March—just a year ago and in that department was just two walls with six windows—three in one end and three in the other. The only ventilation we had. The first or second day I went in there I had six powders to mix so that the girls could get to work and on the third day my powders were getting low and I started in to make them on the work bench and I just began to fall around the room. It was in March and we could not open the windows very well and the girls refused to work while I was mixing the powders and I went to the superintendent and he said do the best that you can. He said the girls could stay out while I was working and then they came back after an hour and a half and started to work. I having charge of the department,

I could not tolerate that. The girls would look to me for work and I finally found a way of going into a room that was isolated from the rest of the rooms in March, 1928. It only had one window in it. * * * I could not let the door open because the powder would be blown out in the other room and I would have trouble with the girls. Q. You told the boss about that when they made the inspection? A. At the time they made the inspection there was nothing to it. I had become sick. I asked the boss to move me out of there. Q. When was that? A. That was before Christmas. He saw that I was getting short of breath. He hinted to me that I was pretty well done up and he would get somebody to fill my place. Q. Was it necessary for you to wear a mask? A. Yes, sir; we had a respirator. Q. Describe it? A. We wore a rubber respirator with the sponge. In the summer time it was impossible to wear them. It would burn a red mark around there, so we took a piece of cheese cloth and I had mine with a piece of raw cotton in it. Q. You had that over your nose? A. Over my nose and mouth like that (indicating). Q. Was it necessary for you to wear this mask all the time? A. I suppose that it was necessary to wear it all the time. Q. What is your trouble now? Why aren't you working? A. Well, it seems as though my heart has been affected and I can't breathe. My disability, of course, I don't know what causes it. Except what I went through—the room, you understand, working that way."

He testified further that prior to his present employment he had been in good health. As soon as he would make a batch, a headache would come on and eventually he had to quit. The fumes would burn his eyes. Asked, "You didn't see any danger in the department at that time (three years before)? he answered, "Yes, sir; I saw the danger in it, but the idea was you can be careful at anything." Mrs. Gunter testified that her husband had "been complaining with these symptoms since they changed his position from the big room into the small room about a year ago. His headaches did not start until he had been working in the small room a few weeks."

The attending physician testified that the claimant had high blood pressure. "His heart is not compensated and he has nephritis, which is Bright's disease." "He complained of intense headache, shortness of breath, extreme nervousness." Patient told him, "it made him feel very giddy and gave him a headache from inhaling those fumes." Asked, "Would the fact that he worked around these chemicals and inhaling these fumes cause the condition he complained of in your opinion?" he answered, "It is possible." "His nephritis and Bright's disease was due to a poison in the system which he probably absorbed in the plant where he worked." The claimant consulted the physician in the fall of 1928, and he then advised the claimant to get some other work, as the work he was doing was not agreeing with him. When claimant began consulting him about his headaches, he said, "it was some kind of chemical poisoning," could not say what kind, but assumed it was "because of where claimant was employed, but he found nothing definite that told him he was ill from chemical poisoning. He did not examine claimant, but his condition was possibly due to cyanide or mercury poisoning."

This is substantially the evidence which the claimant contends establishes his right to compensation for accidental injury, and which the employer and insurer contend supports their theory of an occupational disease, for which there is no compensation provided by the act. The claimant relies on the case of *Victory Sparkler Co. v. Francks,* 147 Md. 368, as decisive in his favor of the question involved. In that case an occupational or industrial disease is defined as one "which arises from causes incident to the profession or labor of the party's occupation or calling. It has its origin in the inherent nature and mode of work of the profession or industry, as its usual result or concomitant. If, therefore, a disease is not the customary and natural result of the profession or industry *per se,* but is the consequence of some extrinsic condition or independent agency, the disease or injury cannot be imputed to the occupation or industry disease." An accidental injury is an unforeseen event, occurring without design, while occupational diseases arise from causes incident

to certain occupations and do not occur suddenly. *Adams v. Acme White Lead & Color Works,* 182 Mich. 157. An occupational disease is a diseased condition arising gradually from the character of the employee's work, but is not an accident; it differs from an accident in that the disability comes on gradually and cannot be fixed at any particular time and by any certain event. *Peru Plow and Wheel Co. v. Industrial Commission,* 311 Ill. 216. A typical illustration of an occupational disease is that of lead poisoning, commonly suffered by painters, and has generally been held not to be compensable under statutes providing for compensation based on accidental injuries. In the *Victory Sparkler* case, *supra,* the injury, necrosis of the jaw, caused by phosphorus poisoning in a fireworks factory, was local in its effect and was referable to a certain time, place, and cause, and was there held to be "accidental by every test of the word, and its accidental nature is not lost by calling the consequential result a disease."

Bright's disease, or nephritis, is a distinct, well known, clearly defined disease of the kidneys, though the medical profession confesses itself more or less ignorant as to its cause and unsuccessful in its treatment. It is also commonly known to be either acute or chronic, with different results as to each of them.

The physician testifying in this case, and the only one whose testimony tends to prove the connection between the employment and the disease from which the claimant is suffering, testified that "it is possible" that the claimant's condition was due to his work around chemicals and inhaling their fumes; that his nephritis or Bright's disease was due to poisons in the system which he probably absorbed in the plant where he worked; that he ascribed his headaches, when he first began calling upon him for treatment, to "some kind of chemical poisoning"; that he had not examined the claimant, but his condition was possibly due to cyanide or mercury poisoning; that he had not definitely seen anything from his examination of the man's body that suggested that he was suffering from chemical poisoning, and that he had not found

anything, definite or indefinite, in his body and that what he found was "in his symptoms." Asked: "Q. What have you found in the man?" he answers: "These spasmodic headaches and his weak heart and then his kidneys getting in this condition, which he did not have prior to his employment"; all of which he testified he could have had if not working where he was. He further stated that he did not know what kind of chemical poisoning the man had.

The claimant testified that, when working in the larger, ventilated, room for the first two years of his last three years, "the first or second day I went in there I had six powders to mix so that the girls could get to work, and on the third day my powders were getting low, and I started in to make them on the work bench, and I just begun to fall around the room." He had been working in the small, unventilated, room about six months when he went to see his physician about the headaches from which he was suffering, and at that time the doctor ascribed his headaches to the place in which he was working and the kind of work in which he was engaged, and suggested that he change his employment. There does not appear in the testimony anywhere any evidence of the time when the physician suspected that the claimant was afflicted with Bright's disease, or that that would be the result of his earlier symptoms, nor does there appear any time which can be ascertained with any definiteness when he exhibited the symptoms which were found at the time the man became incapacitated. When the doctor did awaken to the fact that he had Bright's disease, the case evidently had become chronic, and there is no evidence of an acute attack at any time, during the last three years of his employment, which might be referable to a particular cause and time. The physician's testimony amounts to no more than that the claimant's present disability might possibly be due to the conditions under which his patient had worked for three years, and that the dizziness and headaches from which the workmen suffered for three years, culminating, as the doctor testified, in Bright's disease, makes of this an occupational disease and therefore not compensable as such.

If the disease was one which might be ascribed to an accidental injury, then that would take it out of the class of occupational diseases, and the question would be one for the jury, with the burden on the employer and insurer. Code, art. 101, sec. 56. But when all the evidence in the case, together with the natural and reasonable inferences therefrom, upon which the claimant depends, is to the indisputable effect that the disease complained of did not arise out of and in the course of his employment, but can only be ascribed, if at all, to the inherent nature and probable course of his employment, without any supervening accidental injury as its cause, the question is one of law, because the only authority to award compensation is under an act of the Legislature, and neither the commission nor this court can extend the operations of the law beyond the scope of the act. *Beyer v. Decker,* 159 Md. 289.

It has been held by this court that an employee who, while at work, suffers or becomes ill from natural causes, cannot claim compensation unless such illness was brought on or accelerated by some act or event accidental in its nature. *Victory Sparkler Co. v. Francks, supra; Standard Gas Equipment Co. v. Baldwin,* 152 Md. 321; *Kauffman Construction Co. v. Griffith,* 154 Md. 55; *Miskowiak v. Bethlehem Steel Co.,* 156 Md. 690; *Atlantic Coast Shipping Co. v. Stasiak,* 158 Md. 349. In *United States Mutual Accident Assn. v. Barry,* 131 U. S. 100, the court approved the following instruction: "That, if a result is such as follows from ordinary means, voluntarily applied in a not unusual or unexpected way, it cannot be called a result effected by accidental means, but that if, in the act which precedes the injury, something unforeseen, unexpected, unusual occurs, which produces the injury, then the injury has resulted through accidental means." In *Iwanicki v. State Industrial Accident Commission,* 104 Or. 650, the opinion therein filed, after reviewing the authorities, summarizes the decisions on the subject as follows: "Throughout all these precedents we find it laid down that where the term 'accident,' especially when it is brought about by violent or external means, is employed, it denotes some sudden, unexpected happening

producing the hurtful result, and must be referable to a certain time and place. The requirements that the claim shall be filed within a certain time after the date of the accident and that the employer must make immediate report of the happening of the accident, enforce this conclusion that the injury must be referable to a certain point of time."

The claimant himself said that, when he was asked by the superintendent to take a job in the bichloride room, "he saw the danger in it, but the idea of it was, you can be careful of anything." It is therefore apparent that there was nothing unexpected or unlooked for in some kind of resulting sickness or discomfort from the occupation. If the illness came on gradually, without any reference to time, suddenness, unexpectedness of cause or event, the disease with which the claimant is now afflicted would not be accidental in its cause. Bright's disease or nephritis may not be common to the employees of such an occupation as that in which the claimant was engaged, but the testimony of his physician gives it that effect, and, in the absence of any other evidence in the record, it is controlling.

There being, in the opinion of this court, no legally sufficient evidence to show that the disability for which compensation is sought originated in an accidental injury, and the evidence that it was occupational being undisputed, the judgment appealed from will be affirmed.

*Judgment affirmed, with costs.*

URNER, J., dissents.