647 A.2d 446

**Robert L. DAVIS**

v.

**DYNCORP et al.**

**No. 155, Sept. Term, 1993.**

Court of Appeals of Maryland.

Sept. 15, 1994.

Richard W. Galiher, Jr. (Galiher, Clarke & Galiher, on brief), Rockville, for appellant.

Kathryn S. McAleer (Timothy E. McLaughlin, Dirska & Levin, on brief), Columbia, for appellee.

Argued Before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

CHASANOW, Judge.

In this appeal, we are called upon to determine whether appellant's "mental disease," allegedly resulting from on-the-job harassment, "is due to the nature of an employment in which hazards of the occupational disease exist." Maryland Code (1991 Repl.Vol.), Labor and Employment Article, § 9–502(d)(1)(i).[1] For the following reasons, we hold that the disease alleged in the instant case is not due to the nature of appellant's employment and, therefore, is not compensable under the Maryland Workers' Compensation Act.

---

1. Unless otherwise specified, all references to §§ 9–101 *et seq.* are to the Maryland Code (1991 Repl.Vol.), Labor and Employment Article.

I.

In July of 1990, Appellant Robert L. Davis filed a claim with the Workers' Compensation Commission against the Appellee Dyncorp and its insurer National Union Fire Insurance Company. The crux of Davis's claim was that he suffered a disabling occupational disease as the result of "continual harassment" by both management and fellow employees at Dyncorp. Davis had been employed by Dyncorp since February 1986 as a computer operator.

At a 1992 hearing on his workers' compensation claim, Davis explained that, beginning in April of 1987 and extending over a couple of years, he was subjected to the following incidents of "harassment": (1) someone at work placed an explosive in his cigarette; (2) a co-worker placed a tack on his seat; (3) he was denied the use of a refrigerator and told to pay $10 if he wished to continue using it because he failed to take his turn cleaning it; (4) a "match box sticker" was placed on his desk, which explained how to obtain a high school diploma in one's spare time (Davis is a college graduate); (5) co-workers defaced a Department of Defense decal on Davis's vehicle at a nightclub; (6) after leaving work one day, a co-worker followed Davis in his vehicle "too close[ly]" for about a quarter mile; (7) while walking in the street on his way to the store, Davis was frightened by a co-worker, who pulled up behind Davis in an automobile, roared the engine, then hit the brakes; (8) Davis received annoying phone calls at home; and (9) Davis was called racially offensive names by fellow workers.[2] As a result of these and other similar incidents, Davis alleged that he experienced restlessness, sleeping problems, headaches, and developed post-traumatic stress syndrome, which prevented him from returning to work. Davis therefore main-

---

**2.** We note that several of the incidents complained of by Davis did not occur at work. Further, there was evidence before the Commission that Davis was having domestic problems with his wife in 1987. One of Davis's witnesses also testified that Davis complained about sleeping problems after a non-work related accident in 1988, and Davis himself admitted that the non-work related accident caused him mental grief and frustration because of limitations due to his injuries.

tained that he was entitled to workers' compensation benefits because of a disabling occupational disease.

The Workers' Compensation Commission, however, disallowed Davis's claim based on its finding that Davis "did not sustain an occupational disease of mental disorder arising out of and in the course of employment." Subsequently, Davis appealed to the circuit court. In a motion for summary judgment, Dyncorp maintained that even if all of Davis's allegations were true, Dyncorp was entitled to judgment as a matter of law. Their first argument in support of their motion relied on language in *Belcher v. T. Rowe Price,* 329 Md. 709, 621 A.2d 872 (1993), in which we stated that " 'a mere showing that a mental injury was related to *general conditions* of employment, or to incidents occurring over an extended period of time, is not enough to entitle the claimant to compensation. The mental injury must be precipitated by an accident, i.e., an unexpected and unforeseen event that occurs suddenly or violently.' " 329 Md. at 739–40, 621 A.2d at 887 (quoting *Sparks v. Tulane Med. Ctr. Hosp. & Clinic,* 546 So.2d 138, 147 (La.1989)). Dyncorp therefore argued that this language in *Belcher* precluded Davis's recovery because his mental injury was related to general conditions of his employment. Davis, arguing to the contrary, maintained that *Belcher* was limited to accidental injury cases, and therefore was not controlling with respect to occupational diseases.

Another ground for Dyncorp's motion was that the language of § 9–502(d) did not encompass Davis's claim. That section limits an employer's and an insurer's liability to cases where:

"(1) the occupational disease that caused the death or disability:

(i) is *due to the nature of an employment in which hazards of the occupational disease exist* and the covered employee was employed before the date of disablement; or

(ii) has manifestations that are consistent with those known to result from exposure to a biological, chemical, or physical agent that is attributable to the type of employ-

ment in which the covered employee was employed before the date of disablement; and

(2) on the weight of the evidence, it reasonably may be concluded that the occupational disease was incurred as a result of the employment of the covered employee." (Emphasis added).

*Id.* Focusing on § 9–502(d)(1)(i), the parties primarily disagreed over whether an injury allegedly resulting from harassment could be deemed "due to the nature" of Davis's employment as a computer operator.

The Circuit Court for St. Mary's County (Briscoe, J.), appeared to accept Dyncorp's characterization of the quoted language from *Belcher.* Nevertheless, the court held that even if *Belcher*'s language did *not* apply to an occupational disease, as Davis contended, summary judgment should be granted for Dyncorp based on § 9–502(d)(1). Addressing § 9–502(d)(1), Judge Briscoe stated the following:

"Harassment by fellow employees is neither a hazard within the nature of the employment of a computer data operator nor a biological, chemical or physical agent attributable to the type of employment."

The judge thus concluded that, "[a]s a matter of law, the Plaintiff's condition is not compensable under the Workers' Compensation statutes [and] ... summary judgment is granted to the Defendants."

Davis appealed to the Court of Special Appeals, and prior to the intermediate appellate court's consideration of the case, we granted Davis's petition for certiorari to address the following issues: (1) Whether the quoted language in *Belcher* applies only to accidental injury cases, or whether it extends to occupational diseases and therefore prohibits Davis, as a matter of law, from receiving compensation benefits for "post-traumatic stress syndrome arising from harassment by fellow employees"; and (2) Whether § 9–502(d)(1) requires the employer to provide occupational disease compensation for "job harassment which causes mental injury." We shall address each issue respectively.

## II.

In *Belcher*, we were "called upon to determine the expanse of the phrase 'accidental personal injury' in the contemplation of the [Workers' Compensation] Act." 329 Md. at 711, 621 A.2d at 873. In that case, a three-ton beam crashed without warning through the concrete roof of the claimant's office and landed five feet from her desk. "The sound was deafening; it was [as] if a bomb had exploded. The lights in the office went out; pipes and wires were ripped apart; debris sifted over her and her surroundings; concrete dust went down her throat." 329 Md. at 713, 621 A.2d at 874. As a result of this incident, Ms. Belcher suffered from post traumatic stress disorder. 329 Md. at 714, 621 A.2d at 874–75.

After recognizing that "mental injuries can be as real as broken bones and may result in even greater disabilities," 329 Md. at 736, 621 A.2d at 885, this Court in *Belcher* held that "an injury under the Act may be psychological in nature if the mental state for which recovery is sought is capable of objective determination." 329 Md. at 745–46, 621 A.2d at 890. We cautioned, however, " 'that a mere showing that a mental injury was related to *general conditions* of employment, or to incidents occurring over an extended period of time, is not enough to entitle the claimant to compensation. The mental injury must be precipitated by an accident, i.e., an unexpected and unforeseen event that occurs suddenly or violently.' " 329 Md. at 739–40, 621 A.2d at 887 (quoting *Sparks*, 546 So.2d at 147 (emphasis in original)). Based on this language, Dyncorp contends that *Belcher* controls the instant case. We disagree.

We specifically stated in *Belcher* that we were addressing the scope of the phrase "accidental personal injury." 329 Md. at 711, 621 A.2d at 873. No reference to occupational diseases is made anywhere in the opinion. The statement that a mental injury must be "precipitated by an accident," rather than from "incidents occurring over an extended period of time," was intended to be read within the context of ascertaining whether there was a compensable accidental injury. 329 Md. at 739–40, 621 A.2d at 887 (quoting *Sparks*, 546 So.2d at

147). In determining whether the mental injury in *Belcher* was an accidental personal injury, we did not intend to address the complicated question of whether and what types of mental injuries are compensable under the rather antithetical category of occupational diseases. *See Lovellette v. City of Baltimore*, 297 Md. 271, 284, 465 A.2d 1141, 1148 (1983) ("[O]ccupational diseases and accidental personal injuries are, in general, antithetical in nature . . . ."). Because *Belcher* does not resolve, as a matter of law, Davis's claim for compensation under the occupational disease statute based on "post-traumatic stress syndrome arising from harassment by fellow employees,"[3] we shall now address whether the language of § 9–502(d)(1) precludes such a claim.

### III.

In support of their arguments regarding the compensability of work-induced mental stress as an occupational disease, Davis and Dyncorp have cited cases from other jurisdictions respectively accepting or rejecting the notion that mental stress in the workplace can be compensable as an occupational disease. *Compare McMahon v. Anaconda Co.*, 208 Mont. 482, 678 P.2d 661 (1984); *Matter of Compensation of James*, 290 Or. 343, 624 P.2d 565 (1981); *Sawyer v. Pacific Indemnity Co.*, 141 Ga.App. 298, 233 S.E.2d 227 (1977); *Allen v. Goodyear Aerospace*, 13 Ohio App.3d 190, 13 OBR 237, 468 N.E.2d 779 (1984), *with Rambaldo v. Accurate Die Casting*, 65 Ohio St.3d 281, 603 N.E.2d 975 (1992); *Gatlin v. City of Knoxville*, 822 S.W.2d 587 (Tenn.1991); *Douglass v. State, Reg. & Licensing*, 112 N.M. 183, 812 P.2d 1331 (App.), *cert. denied*, 112 N.M. 77, 811 P.2d 575 (1991). *See also*, Donald M. Zupanec,

---

**3.** At the circuit court hearing on Dyncorp's motion for summary judgment, Davis's counsel described his client's claim as follows: "Mr. Davis can't point to one event as the straw that broke the camel's back . . . because in order to show how his psyche became impaired you have to show that over a period of time there were various incidents causing him to be upset, discouraged, ridiculed, et cetera, and it is the combination of these within the employment atmosphere, encouraged by the employer perhaps by not doing anything about it which rendered him to have his post traumatic stress disorder."

Annotation, *Mental Disorders as Compensable under Workmen's Compensation Acts*, 97 A.L.R.3d 161 (1980 & Supp. Aug. 1993). The cases cited generally deal with interpretations of statutory language which are distinct from Maryland's occupational disease statute.[4] We therefore rely primarily on an examination of our own statute and the analysis provided by our prior case law in determining the issue before us.

"It often is necessary to look at the development of a statute to discern legislative intent that may not be as clear upon initial examination of the current language of the statute." *Condon v. State*, 332 Md. 481, 492, 632 A.2d 753, 758 (1993). Thus, we believe a brief summary of the development of Maryland occupational disease law may be helpful in understanding the goal behind this area of legislation before ascertaining whether Davis's claim is compensable.

Traditionally, occupational diseases were not compensable under the Workers' Compensation Act. *See* J. Nicholas Shriver, Jr., *The Maryland Occupational Disease Law*, 4 Md. L.Rev. 133, 135 (1940). In fact, early case law definitions of "occupational disease" originated in cases which sought to distinguish between accidental injuries, for which recovery was permitted, and occupational diseases, which were not compensable under the Act. *See, e.g., Foble v. Knefely*, 176 Md. 474, 486, 6 A.2d 48, 53 (1939) ("[A]n occupational disease ... may be defined as some ailment, disorder, or illness which is the expectable result of working under conditions naturally inherent in the employment and inseparable therefrom, and is ordinarily slow and insidious in its approach."); *Gunter v. Sharp & Dohme*, 159 Md. 438, 443, 151 A. 134, 136 (1930) (explaining that an occupational disease arises "gradually from the character of the employee's work," and stating that "[a] typical illustration of an occupational disease is that of lead poisoning, commonly suffered by painters ...."); *Victory*

---

4. We do note, however, that only Georgia, Montana, Oregon, and Ohio have apparently recognized the possibility of compensation for stress-related disabilities as occupational diseases. *See* 1B Arthur Larson, *Workmen's Compensation Law*, § 41.88, at 7–561 (1987).

*Sparkler Co. v. Francks*, 147 Md. 368, 379, 128 A. 635, 638–39 (1925) ("An occupation or industry disease is one which arises from causes incident to the profession or labor of the party's occupation or calling. It has its origin in the inherent nature or mode of work of the profession or industry, and it is the usual result or concomitant. If, therefore, a disease is not a customary or natural result of the profession or industry, *per se,* but is the consequence of some extrinsic condition or independent agency, the disease or injury cannot be imputed to the occupation or industry, and is in no accurate sense an occupation or industry disease.").

Perhaps sensing the unfairness of not compensating workers for certain occupational diseases,[5] the Legislature enacted the Occupational Disease Amendment to the Workers' Compensation Act in 1939. *See* Chapter 465 of the Acts of 1939. *See also Miller v. Western Elec. Co.,* 310 Md. 173, 182, 528 A.2d 486, 491 (1987) (noting that the Legislature finally "recognized [occupational disease] as a problem, like on-the-job accidental injury, that an industrial society had to address in a comprehensive fashion"). This Amendment provided a "schedule of [compensable] diseases includ[ing] a large number of all that apparently could arise from the nature of Maryland industry." Shriver, 4 Md.L.Rev. at 144. *See* Ch. 465 of the Acts of 1939, § 32A, at 991–95 (listing, *inter alia,* lead poisoning, phosphorus poisoning, arsenic poisoning, ammonia poisoning, silicosis, and asbestosis). Under the Amendment, " '[o]ccupational [d]isease' . . . mean[t] only the diseases

---

5. The 1925 case of *Victory Sparkler Co. v. Francks,* 147 Md. 368, 128 A. 635 (1925) has been perceived as "Maryland's attempt to legislate occupational disease coverage by judicial interpretation" before the Legislature formally took action in 1939. J. Nicholas Shriver, Jr., *The Maryland Occupational Disease Law,* 4 Md.L.Rev. 133, 135 n. 14 (1940). In *Victory Sparkler,* a young girl "gradually contracted" phosphorus poisoning while working in a fireworks plant. 147 Md. at 373, 128 A. at 636. Although occupational diseases were noncompensable at that time, this Court characterized the girl's ailment as an accidental injury and therefore compensable. The Court stated, "[t]he fact that [the girl] . . . continued at her place of labor, in the doing of her common and regular task, makes it clear that the phosphorous poisoning happened without her design or expectation, and so her injury was accidental." *Victory Sparkler,* 147 Md. at 379, 128 A. at 639.

enumerated and specified in [the schedule]." Ch. 465 of the Acts of 1939, § 65(13), at 1006.

Although only certain occupational diseases were originally enumerated, the statutory definition of occupational disease was later generalized by eliminating the reference to the schedule of specific illnesses. In 1951, the Legislature provided that " '[o]ccupational [d]isease' as used in this Article shall mean the event of an employee's becoming actually incapacitated, either temporarily, partially or totally, because of [a] disease contracted as the result of and in the course of employment...." Ch. 289 of the Acts of 1951, § 67(13), at 752. This language has been substantially retained in the current definition of occupational disease contained in § 9–101(g). That section defines an occupational disease as follows:

> " 'Occupational disease' means a disease contracted by a covered employee:
>
>> (1) as the result of and in the course of employment; and
>>
>> (2) that causes the covered employee to become temporarily or permanently, partially or totally incapacitated."

§ 9–101(g). Even though the statute is no longer limited to certain, specified occupational diseases, "[i]t should be borne in mind that the Act is designed to provide compensation to workers injured by the *effects of industry*," and therefore, "the definition of occupational disease should not be read too loosely ... while a claimant might prove that a common cold was contracted in the workplace and that lost time resulted, compensation for that occurrence would far exceed the scope of remedy contemplated by the General Assembly." Richard P. Gilbert & Robert L. Humphreys, Jr., *Maryland Workers' Compensation Handbook*, § 8.2–2, at 168–69 (2d ed. 1993) (emphasis added).

Simply because a disease falls within § 9–101(g)'s definition of occupational disease, however, does not mean it is compensable. Section 9–101(g) must be read in conjunction with § 9–502(d), which limits an employer's and insurer's liability to those cases where the occupational disease that causes the

disablement is either "due to the nature of an employment in which hazards of the occupational disease exist" [6] or the disease "has manifestations that are consistent with those known to result from exposure to a biological, chemical, or physical agent that is attributable to the [employee's] type of employment...." Section 9–502(d) further provides that in order to be a compensable occupational disease, "on the weight of the evidence, it reasonably may be concluded that the occupational disease was incurred as a result of the employment...." As we explained in *Miller*, these provisions "emphasize[ ] legislative concern with causation." 310 Md. at 183, 528 A.2d at 491.

With this background in mind, we shall now address Davis's contention that his mental disease allegedly resulting from job harassment is "due to the nature of an employment in which hazards of the occupational disease exist."

## IV.

We are not convinced that Davis's mental disease could in fact constitute an occupational disease as defined by § 9–101(g). However, even assuming that Davis's disease was contracted "as the result of and in the course of employment" under § 9–101(g), we hold that it is not compensable under § 9–502(d)(1)(i) because it was not "due to the nature of an employment in which hazards of the occupational disease exist." [7] Given its ordinary meaning, the word "nature"

---

6. Although § 9–502(d) has undergone various transformations in reaching its present form, one constant has been the requirement that, in order to be compensable, an occupational disease must be due to the nature of an employment in which hazards of the occupational disease exist. *See* Chapter 465 of the Acts of 1939, § 32C, at 996; Ch. 290 of the Acts of 1951, § 23(c), at 754; Ch. 151 of the Acts of 1967, § 23(c), at 263; Ch. 706 of the Acts of 1980, § 23(c)(1), at 2431.

7. The amicus brief submitted on behalf of various workers' compensation payors in Maryland relies heavily upon the judicial definitions of "occupational disease" contained in *Foble v. Knefely*, 176 Md. 474, 486, 6 A.2d 48, 53 (1939) and *Victory Sparkler*, 147 Md. at 379, 128 A. at 638–39. Although these definitions may be of some assistance, they should not be unduly relied upon. As Professor Larson has explained,

means "[a] kind, sort, type, order; general character." Black's Law Dictionary 1027 (6th ed. 1990). *See also* Webster's Third New International Dictionary 1507 (Philip Babcock Gove ed. 1986) (defining "nature" as "the distinguishing qualities or properties of something"). Thus, the question becomes whether mental disease caused by his job harassment may be reasonably characterized as due to the general character of Davis's employment. We believe that it cannot.

Davis was employed as a computer operator, which entailed, among other tasks, the entry of data. According to Davis, he spent about 80% of his day entering data, and the other 20% of the day preparing paperwork, answering the telephone, and reading manuals and other publications. We agree with the circuit court's observation that "[h]arassment by fellow employees is n[ot] a hazard within the nature of the employment of a computer data operator...." We see nothing peculiar to Davis's duties as a computer operator that made him more susceptible to harassment than in any other kind of employment. We note that the legislative emphasis on the relationship between a particular disease and a particular type of employment was certainly evident in the original workers' compensation legislation. For instance, adjacent to the column of diseases was a column describing the type of employment within which the disease might be contracted. *See* Ch. 465 of the Acts of 1939, § 32A, at 992–95 (describing, for

---

"[d]efinitions of 'occupational disease' should always be checked against the purpose for which they were uttered." 1B Arthur Larson, *Workmen's Compensation Law* § 41.31, at 7–361 (1987). Larson distinguishes between definitions created for the purpose of "defeating compensation because an injury is 'not an accident but an occupational disease' in jurisdictions which had at the time of the decision no occupational disease coverage," *id.* (*i.e., Foble* and *Victory Sparkler* ), and those created to allow "awards for occupational disease under general definitions of the term, as against the contention that the disease is an ordinary nonindustrial illness." *Id.* Professor Larson believes that "[i]t is of little value, and, indeed, may be quite misleading, to quote indiscriminately from old definitions whose only purpose was distinguishing accident." *Id.* § 41.32, at 7–367. Thus, in determining whether a compensable occupational disease is alleged in the instant case, the statutory language contained in § 9–101(g) and § 9–502(d)(1)(i) is of primary relevance.

example, that "[a]nthrax" was associated with "[h]andling of wool, hair, bristles, hides or skins"). Although the specific diseases and employment descriptions have been eliminated, the necessity of a relationship between the particular disease and the "nature" of one's employment still exists. In the instant case, there simply is not the requisite relationship between the nature of Davis's work and the "disease" that he allegedly sustained.

In reaching our conclusion that the harassment incurred by Davis did not result in an occupational disease which was due to the nature of his employment, we note that other jurisdictions have recognized that harassment, albeit sexual, is not a hazard within the nature of most work environments. *See e.g., Murphy v. ARA Services, Inc.*, 164 Ga.App. 859, 298 S.E.2d 528, 531 (1982) ("We refuse to say that the risk of [sexual harassment] . . . belongs to or is in any way connected with what appellant had to do in fulfilling her responsibilities [as a cafeteria worker]."); *Marable v. Singer Business Machines*, 92 N.M. 261, 263, 586 P.2d 1090, 1092 (App.1978) (stating that "[a] disease caused by harassment of male employees is not a natural incident of the employment. It is not linked with the process used by the employer by which the disease is caused, therefore, it is not an occupational disease.").

Finally, although Dyncorp broadly asserts that "the Maryland Workers' Compensation law should not be expanded to include stress-related claims absent the requisite physical injury or catastrophic event," we are not willing to rule out the possibility that some gradually resulting, purely mental diseases could be compensable occupational diseases or that there may be circumstances where work-induced stress may result in a compensable occupational disease.[8] Today, we merely hold that the mental disease resulting from the harassment encountered by Davis was not due to the nature of his

---

8. The issue of compensability for job-induced stress or harassment as an occupational disease is one which the legislature may wish to consider addressing in the future.

employment. The circuit court properly rejected Davis's claim.[9]

*JUDGMENT OF THE CIRCUIT COURT FOR ST. MARY'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.*

---

9. By reaching this conclusion, we in no way condone the type of harassment alleged in the instant case. We simply conclude that compensation for Davis's disease is not within the scope of Maryland's Workers' Compensation Acts. Davis certainly has other remedies to combat the infantile conduct and offensive language which he allegedly was subjected to by his fellow employees. Davis filed a civil suit and complaints with the EEOC and U.S. Department of Labor against Dyncorp. These disputes were resolved as the result of a settlement in which Davis received $25,000.