684 A.2d 868

**LUBY CHEVROLET, INC., et al.**

v.

**Jean Y. GERST.**

**No. 126, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Nov. 7, 1996.

178

Alan M. Carlo (Diane S. Deros and Mason, Ketterman & Morgan, P.A., on the brief), Baltimore, for Appellants.

James R. Farmer (Turnbull, Mix & Farmer, on the brief), Towson, for Appellee.

Argued before HARRELL and EYLER, JJ., and PAUL E. ALPERT, Judge (Retired), Specially Assigned.

EYLER, Judge.

The question of first impression presented by this case is whether, under Maryland's Worker's Compensation Act, a new disease that develops subsequent to an occupational disease award may form the basis for reopening and modifying that award under § 9–736(b), Md.Code Ann., Labor & Employment Art. (1991 Repl.Vol., 1996 Supp.). We hold that when the claimant has established a causal link between the initial, compensable disease and the subsequent disease, the claimant may reopen and obtain a modification of the award.

### Facts

In 1986, Jean Y. Gerst, appellee, began working for Luby Chevrolet, Inc., appellant,[1] as an office manager. Appellee's duties included daily key punching, light typing, and the use of calculators and computers to balance her employer's books. Appellee began experiencing problems with her hands in February or March of 1987 and was treated by a physician in October or November 1987. In January 1988, appellee underwent two separate surgical procedures for carpal tunnel release on her right hand and left hand, respectively. After the first surgical procedure, appellee returned to work on the next working day, and, at the end of that day, she was told that she could not keep up with her work and was terminated.

Appellee filed a claim for injury to her right and left hands in May 1988. Appellee testified at a hearing in October 1988 that she was experiencing problems with her hands; there was no testimony with respect to any problems with her elbows. The Worker's Compensation Commission (Commis-

---

1. American and Foreign Insurance Company, insurer of Luby Chevrolet, Inc., is also an appellant.

sion), by order dated November 1, 1988, found that appellee had sustained an occupational disease, *i.e.,* "bilateral carpal tunnel syndrome", and that the first date of disablement was in March 1987. That decision was appealed to the Circuit Court for Baltimore City and affirmed after a bench trial. In the meantime, based on a stipulation between the parties, the Commission, by order dated January 3, 1990, awarded permanent partial disability for the "left hand" and the "right hand," as a result of "bilateral carpal tunnel syndrome."

In August 1988, appellee began working at Watson's Fireplace and Patio as a bookkeeper, and she worked there for approximately one and one-half years. From November 1989 until October 1994, appellee worked as a bookkeeper/accountant at Key Oldsmobile. Subsequent to that employment, appellee worked for B & L Sales as a buyer and for Key Leasing as a bookkeeper.

Soon after beginning her work at Key Oldsmobile in 1989, appellee began experiencing problems with her right elbow and numbness and tingling in her pinky finger and ring finger. This was different from the pain in her forefinger and thumb that she had been experiencing up to that point. Appellee's problems progressed so that her grip was weakened and she experienced pain. Appellee never missed any work as a result of these new complaints.

On August 1, 1994, appellee filed in her original claim a request for emergency hearing on medical expenses, based on a worsening of condition, and the insurer's denial of payment for corrective surgery. A hearing was held on September 7, 1994 and, on October 21, 1994, the Commission entered an order in which it granted appellee's petition to reopen. The Commission rephrased the issues as "causal relationship—elbow condition" and "authorization for surgery as recommended by Dr. Franks in his reports dated 6/6/94 and 6/20/94." The Commission further found that appellee's elbow condition was not causally related to the occupational disease with date of disability of March 15, 1987 and, therefore, denied the request for authorization for surgery.

Appellee filed a petition for judicial review on November 17, 1994. The case was tried before a jury on September 20 and 21, 1995. The trial judge denied appellants' motions for judgment at the close of appellee's case and at the close of all of the evidence. The jury was presented with the following issue: "Is the claimant's cubital tunnel syndrome causally related to her carpal tunnel syndrome which the Commission found she had as of March 15, 1987?" On September 21, 1995, the jury answered that issue in the affirmative.

At trial, appellee called Dr. Denis Franks, a hand surgeon and treating physician. Dr. Franks testified that he first saw appellee on December 11, 1987, and that he diagnosed her condition as bilateral carpal tunnel syndrome. She underwent surgery on the right hand on January 13, 1988 and on the left hand on January 29, 1988. Dr. Franks described carpal tunnel syndrome as a disorder that affects the median nerve and testified that the most common cause is repetitive trauma/action. The witness testified that cubital tunnel syndrome is a disorder that affects the ulnar nerve and that appellee's first complaint of ulnar nerve involvement was in August 1988. By June 1990, appellee clearly exhibited signs of bilateral cubital tunnel syndrome, although at that time she did not exhibit any conduction abnormalities. Dr. Franks opined that cubital tunnel syndrome is related to repetitive stress to the elbows and observed that it is not unusual for it to develop in patients with carpal tunnel syndrome because they modify the way in which they use their hands. He further opined that appellee's cubital tunnel syndrome was causally related to her employment with appellee, Luby Chevrolet, in 1987 to 1988. The doctor indicated that it was his impression that appellee had changed the way she used her arms after developing carpal tunnel syndrome, thereby aggravating what was probably "an indolent condition." He described an indolent condition as meaning that the condition was present in 1987 to 1988 but not symptomatic. The witness pointed to appellee's complaint with respect to her left elbow in August 1988 and her complaint with respect to her right elbow in February 1990. The doctor acknowledged, on cross-examination, that carpal

tunnel syndrome does not cause cubital tunnel syndrome. In June 1994, Dr. Franks recommended surgery on appellee's right arm for cubital tunnel syndrome.

Appellant called Dr. Louis Halikman, an orthopedic surgeon, as an expert witness. Dr. Halikman testified that carpal tunnel syndrome and cubital tunnel syndrome are caused by the same underlying inflammatory condition but carpal tunnel syndrome does not cause cubital tunnel syndrome.

Appellant presents three questions for our consideration.

1. Can a claimant who has been compensated for an occupational disease reopen and receive benefits under that claim when she develops a different occupational disease which she claims is causally related to the first occupational disease?

2. Did the trial court err in denying appellants' motions for judgment based on the fact that at the time of trial appellee had never been disabled by cubital tunnel syndrome?

3. Did the trial court err in denying appellants' motions for judgment based on the last injurious exposure rule?

### Discussion

Maryland's Worker's Compensation Act (the "Act") provides for the compensation of accidental injuries arising out of and in the course of employment and occupational diseases that are contracted as the result of and in the course of employment. Md.Code Ann., Labor & Employment, §§ 9–101, 9–501, 9–502 (1991 Repl.Vol., 1996 Suppl.) [2] In order to maintain a claim for occupational disease, a claimant must show, in addition to a causal link to the employment, that the hazards of the disease are inherent to the nature of the employment, i.e., nonaccidental. § 9–502(d). Further, the claimant must show that she has been actually incapacitated by the disease. § 9–101(g)(2). The Act assigns the obligation

---

2. Unless otherwise indicated, all statutory references shall be to this article.

of compensation to "the employer in whose employment the covered employee was last injuriously exposed to the hazards of the occupational disease." § 9–502(b).

In addition to providing compensation for lost wages, the Act also provides compensation for medical expenses incurred in connection with the occupational disease or accidental injury. § 9–660. The Act provides that medical services and treatment shall be paid for by the employer or its insurer for as long as such treatment or service is required, § 9–660(b), notwithstanding the termination of wage compensation. *A.G. Crunkleton v. Barkdoll,* 227 Md. 364, 368, 177 A.2d 252 (1962). The medical benefits are an important portion of the compensation provided to covered employees, and the employer's liability for medical benefits can potentially be immense. *See, e.g., R & T Construction v. Judge,* 323 Md. 514, 521–22, 529–30, 594 A.2d 99 (1991) (holding that this section [3] required the employer/insurer to make modifications to employee's home and to provide and pay for utility service, medical equipment, including an electric wheelchair, a hospital bed, a bedside and a portable respirator, a suctioning device, and an air conditioner).

■ The Act includes a broad reopening provision that gives to the Commission continuing powers and jurisdiction over each claim. § 9–736(b). Subject to a five year statute of limitations,[4] "the Commission may modify any finding or order as the Commission considers justified." *Id.* Worsening of condition is a common cause for reopening a claim. *Stevens v. Rite–Aid Corp.,* 340 Md. 555, 565 n. 11, 667 A.2d 642 (1995).

■ Appellants contend that, as a matter of law, the development of appellee's cubital tunnel syndrome cannot form the

---

3. *Judge* involved application of art. 101, § 37(a), the predecessor of § 9–660. That former section is materially similar to the current provision.

4. The limitations provision does not apply to requests for medical benefits. *Holy Cross Hosp. v. Nichols,* 290 Md. 149, 428 A.2d 447 (1981).

basis for reopening her original worker's compensation claim, because the cubital tunnel syndrome is a new disease that is distinct from the carpal tunnel syndrome which formed the basis of her initial claim and not a worsening of the first disease. Relying on §§ 9–736(b) and 9–502(a), appellants argue that when a new and different disease develops, the claimant's only recourse is to file a new claim.[5] Stated somewhat differently, a *new* occupational disease that arises out of a compensable occupational disease, is not compensable unless it forms the basis for a new claim under the Act. The claim would be made against that employer determined by the last injurious exposure rule. By contrast, appellee argues that she need only establish a causal link between the first disease and the subsequent disease in order to reopen her claim.

In determining the legislature's intent in this regard, we are mindful of the principles that apply to construction of the Act. The Act must be construed as a whole and liberally to carry out its general purpose of compensating individuals who have been injured in the course of their employment. § 9–102; *Para v. Richards Group of Wash. Ltd. Partnership,* 339 Md. 241, 251, 661 A.2d 737 (1995) (quoting *Howard Co. Ass'n Retard. Cit. v. Walls,* 288 Md. 526, 530, 418 A.2d 1210 (1980)); *Lovellette v. City of Baltimore,* 297 Md. 271, 282, 465 A.2d 1141 (1983). Thus, in the event of any ambiguity, the Act should be construed in favor of the injured employee. *Lovellette,* 297 Md. at 282, 465 A.2d 1141. Further, "where a particular provision of a statute is part of a single statutory scheme the legislative intention must be gathered from the entire statute rather than from only one part." *Lowery v. McCormick Asbestos Co.,* 300 Md. 28, 46, 475 A.2d 1168 (1984) (quoting *Guardian Life Ins. v. Ins. Comm'r.,* 293 Md. 629, 446 A.2d 1140 (1982)). Finally, "a well-recognized counter-balancing rule is that a court must not surmise legislative intention contrary to the plain language of a statute." *Id.*

---

5. Appellants acknowledge, however, that a claimant who files a second claim must experience a second incident of disability, and that no such disability occurred in this case.

An examination of § 9–736(b) reveals that there is nothing in the reopening mechanism itself that precludes reopening in this instance. Section 9–736(b) provides in pertinent part as follows:

(b) *Continuing powers and jurisdiction; modification.*—(1) The Commission has continuing powers and jurisdiction over each claim under this title.

(2) Subject to paragraph (3) [6] of this subsection, the Commission may modify any finding or order as the Commission considers justified. . . .

This section has been described, by us and others, as "one of the broadest" reopening provisions in the country. *Subsequent Injury Fund v. Baker,* 40 Md.App. 339, 345, 392 A.2d 94 (1978) (citing A. Larson, 3 *The Law of Workmen's Compensation,* §§ 81–30 to 81–53). *See also Stevens,* 340 Md. at 565 n. 11, 667 A.2d 642 (quoting Richard P. Gilbert & Robert L. Humphreys, Jr., *Maryland Workers' Compensation Handbook,* 155 (2d ed. 1993)). It typically is used "for situations in which a claimant's condition degenerates, entitling the claimant to increased benefits." *Stevens,* 340 Md. at 565 n. 11, 667 A.2d 642. More precisely, it often is used by claimants seeking additional medical benefits. *See, e.g., Holy Cross Hosp. v. Nichols,* 290 Md. 149, 428 A.2d 447 (1981). In this case, appellee was seeking authorization for surgery. The Commission exercised its broad discretion and reopened appellee's claim, but denied appellee relief because it found that there was no causal link between her "elbow condition" and her occupational disease.

Neither does the medical benefits provision answer our question. That provision, § 9–660, provides in pertinent part as follows:

(a) *In general.*—In addition to the compensation provided under this subtitle, if a covered employee has suffered an accidental personal injury, compensable hernia, or occupa-

---

6. Paragraph 3 provides a five year statute of limitations for reopening under this section.

tional disease the employer or its insurer promptly shall provide to the covered employee, as the Commission may require:

(1) medical, surgical, or other attendance or treatment. . . .

This section provides for medical treatment or services occasioned by the covered employee's "accidental personal injury, compensable hernia or occupational disease." Thus, our query turns on the definition of "occupational disease".

■ It is clear that, if this case involved an accidental injury, appellee would prevail inasmuch as the Act defines "accidental injury" to include "a disease or infection that naturally results from an accidental injury . . . including . . . an occupational disease. . . ." § 9–101(b)(3). The phrase "naturally results from an accidental injury" means nothing more than proximate cause in the usual sense. *Dickson Constr. & Repair Co. v. Beasley,* 146 Md. 568, 578–79, 126 A. 907 (1924). This aspect of the accidental injury definition has remained substantively unchanged from the inception of the Act in 1914, and this Court and the Court of Appeals routinely have held that diseases that develop as a result of accidental injuries are compensable. *See, e.g., Bethlehem–Sparrows Point Shipyard, Inc. v. Scherpenisse,* 187 Md. 375, 50 A.2d 256 (1946) (typhus fever compensable where evidence established that it was causally related to wound sustained by employee when he accidentally stepped on a nail during his employment); *Continental Group v. Coppage,* 58 Md.App. 184, 472 A.2d 1014 (1984) (involving seizure disorder causally related to accidental injury to head). Thus, a subsequent development of occupational disease will be considered a worsening of condition in an accidental injury case if the claimant proves the requisite causation between the disease and the accidental injury.

By contrast, the definition of "occupational disease" [7] does not expressly include diseases or infections that naturally

7. Section 9–101(g) defines occupational disease as follows:

result from the occupational disease. § 9–101(g). Thus, we must determine whether, by silence on this issue, the legislature intended to exclude from compensation those diseases or infections that naturally result from a compensable occupational disease.

When the Act first was enacted in 1914, it provided compensation only for accidental injuries. *See* Md.Laws 1914, ch. 800. The term "accidental injury" never was defined by the legislature, and, in the absence of a statutory definition, the Court of Appeals defined it to include only injuries arising from unexpected events or unusual work conditions. *See, e.g., Cambridge Mfg. Co. v. Johnson,* 160 Md. 248, 262, 153 A. 283 (1931). As recently noted by the Court of Appeals, the early cases that defined accidental injury created definitions of occupational disease for the purpose of illustrating the converse of accidental injury. *Davis v. Dynacorp,* 336 Md. 226, 233, 647 A.2d 446 (1994) (citing *Foble v. Knefely,* 176 Md. 474, 486, 6 A.2d 48 (1939); *Gunter v. Sharp & Dohme, Inc.,* 159 Md. 438, 443, 151 A. 134 (1930); *Victory Sparkler & Specialty Co. v. Francks,* 147 Md. 368, 379, 128 A. 635 (1925)).

In 1939, the Act was amended to include compensation for occupational diseases. Md.Laws 1939, ch. 465. The 1939 Act expressly enumerated those diseases that were considered to be industry hazards and, thus, compensable under the Act. With respect to certain, but not all, of the enumerated diseases, the 1939 Act included compensation for "sequelae".[8] In 1951, the legislature replaced the finite list of diseases with a fluid definition of occupational disease that permits the Com-

---

(g) *Occupational disease.*—"Occupational disease" means a disease contracted by a covered employee:

(1) as the result of and in the course of employment; and

(2) that causes the covered employee to become temporarily or permanently, partially or totally incapacitated.

8. At the time of the 1939 enactment, "sequela" was defined, much as it is today, as "[a]ny condition or affection following and caused by an attack of disease." Bernard S. Maloy, M.D., *The Simplified Medical Dictionary For Lawyers* (1942); Merriam–Webster Unabridged Dictionary (2d ed. 1935).

mission to determine on a case by case basis what diseases are occupational diseases compensable under the Act. *See* Md. Laws 1951, ch. 289.

■ Under the current definition, an occupational disease is a disease that is contracted by a covered employee "as the result of and in the course of employment" and that "causes the covered employee to become temporarily or permanently, partially or totally incapacitated." § 9–101(g). An occupational disease is compensable only if the risks of the disease are inherent to the nature of the employment. § 9–502(d); *Davis*, 336 Md. at 235–36, 647 A.2d 446. Thus, the current statutory definition of occupational disease is significantly similar to the pre–1939 case law definition of occupational disease. *See Foble*, 176 Md. at 486, 6 A.2d 48 (defining "occupational disease" as "some ailment, disorder, or illness which is the expectable result of working under conditions naturally inherent in the employment and inseparable therefrom...."); *Victory Sparkler*, 147 Md. at 379, 128 A. 635 ("An occupation or industry disease is one which arises from causes incident to the profession or labor of the party's occupation or calling. It has its origin in the inherent nature or mode of work of the profession or industry, and it is the usual result or concomitant.").

■ The pre–1939 case law definition of "accidental injury" survived the addition to the Act of occupational diseases. *See, e.g., Lettering Unlimited v. Guy*, 321 Md. 305, 309–10, 582 A.2d 996 (1990); *Union Mining Co. v. Blank*, 181 Md. 62, 78, 28 A.2d 568 (1942). That is, there is a continued requirement that the cause of the injury be due to some unusual or unexpected event or condition of employment in order for it to be considered accidental. *Id.* The requirement of unusualness or unexpectedness is the definitive characteristic of accidental injuries. Maryland, unlike many other jurisdictions, historically has rejected the notion that an injury must be sustained suddenly, and at an identifiable point in time, to be considered accidental. *See, e.g., Belcher v. T. Rowe Price Found., Inc.*, 329 Md. 709, 721–22, 621 A.2d 872 (1993);

*Blank,* 181 Md. at 66–78, 28 A.2d 568. Similarly, Maryland has rejected the notion that an injury must manifest in some external trauma, *id.,* or even be physical, to be considered accidental. *Belcher,* 329 Md. at 738, 621 A.2d 872 (holding that psychological injury that manifests in physiological symptoms is compensable). Indeed, the Court of Appeals has found accidental injury in cases where the injury was the development of a disease. *Blank,* 181 Md. at 78–80, 28 A.2d 568 (typhoid fever contracted from drinking water supplied at employer's expense).

So, the defining difference between accidental injury and occupational disease is that the cause of the former is unusual or unexpected and the cause of the latter is usual and a risk inherent to the nature of the employment. Does this difference indicate a rationale for providing expansive compensation for victims of accidental injury while providing more limited compensation for victims of occupational disease? We do not think so. While the difference between the two suggests a rationale grounded in assumption of the risk, such a rationale would be antithetical to the purposes of the Act.

The Court of Appeals' discussion of such purposes in *Lowery* is instructive and worth repeating:

We have a substantial basis of knowledge relating to legislative intent in the initial passage of the Work[er]'s Compensation Act by which benefits for disabilities from accidental injuries arising out of and in the course of employment were provided.

We know that the Legislature thought that industrial disabilities under the rules of the common law and the statutes antecedent to enactment of the Work[er]'s Compensation Act cast "an unequal burden" that should be "more fairly distributed." We also know that the passage of the Work[er]'s Compensation Act was intended to withdraw

extra-hazardous [9] employments "from private controversy"; to provide "sure and certain relief for work[ers] injured" in such employments and "their families and dependents," "regardless of questions of fault and to the exclusion of every other remedy, except as provided in this Act." (footnote omitted). (Preamble, ch. 465, Acts of 1939).

\* \* \* \* \* \*

We believe that the legislative purpose in the passage of the initial Occupational Disease Act (ch. 465, Acts of 1939) was to bring within the purview of the Work[er]'s Compensation Act disability caused by specified occupational diseases produced by the workplace environment without change in the basic social aspects of the law and we attribute to the 1939 Legislature the same high ideals and the same high social aims that motivated the Legislature of 1914.

300 Md. at 46–47, 475 A.2d 1168. Ascribing to the legislature a rationale grounded in assumption of the risk would frustrate the legislature's intent to provide to victims of occupational disease sure and certain relief without regard to fault.

 We now examine the differences in the Act's treatment of "accidental injuries" and "occupational diseases". As appellants have noted, the Act treats "accidental injuries" and "occupational diseases" very differently in two salient respects. First, before an occupational disease is compensable under the Act, it must cause some disablement.[10] *Miller v. Western Electric Co.*, 310 Md. 173, 185–86, 528 A.2d 486

---

9. As noted by the *Lowery* Court, current provisions of the Act apply to substantially all employments, hazardous or not. *Id.* at 46 n. 12, 475 A.2d 1168.

10. The Act defines "disablement" as "the event of a covered employee becoming partially or totally incapacitated: (1) because of an occupational disease; and (2) from performing the work of the covered employee in the last occupation in which the covered employee was injuriously exposed to the hazards of the occupational disease." § 9–502(a). Actual wage loss is not necessary to demonstrate disablement. *Miller v. Western Electric Co.*, 310 Md. 173, 186–87, 528 A.2d 486 (1987).

(1987); *Lowery,* 300 Md. at 47, 475 A.2d 1168; *Shifflett v. Powhattan Mining Co.,* 293 Md. 198, 201, 442 A.2d 980 (1982). Conversely, no disability is required for an accidental injury to be compensable. *Id.*

 Appellants argue that, in this case, appellee cannot recover because cubital tunnel syndrome is a new disease and she did not experience any disablement resulting from the new disease. Appellants' argument suggests that permitting appellee to reopen her original claim would violate the disablement requirement. We disagree. The date of disablement in an occupational disease case serves the same purpose as the date of occurrence in an accidental injury case. Given that occupational diseases usually develop slowly over time, the legislature has recognized the importance of fixing the date upon which they become compensable.[11] *Lowery,* 300 Md. at 47, 475 A.2d 1168. The fixing of the date helps to limit proof of causation problems and potential limitations problems. *Id.* The fixing of that date, however, is not inconsistent with providing that everything that causally flows from a compensable disease is compensable.

Second, in an occupational disease case, liability is assigned to the employer in whose employment the claimant was last injuriously exposed to the hazards of the disease. § 9–502(b); *Lowery,* 300 Md. at 48, 475 A.2d 1168. Similar to the disablement requirement, this rule was created in recognition of the fact that occupational diseases often develop slowly and insidiously. By assigning liability to the employer in whose employment the claimant was last injuriously exposed, the rule "eliminat[es] the often impossible burden of proving medical causation of the disease to a particular work place." *Id.* at 48, 475 A.2d 1168; *CES Card Establishment Servs. v. Doub,* 104 Md.App. 301, 312, 656 A.2d 332 (1995).

 Appellants argue that permitting appellee to recover from appellants in this case violates the last injurious

---

**11.** As we noted earlier, accidental injuries also may develop slowly over time. *Blank,* 181 Md. at 78, 28 A.2d 568.

exposure rule because appellee continued to be exposed to repetitive trauma in subsequent employments after she left Luby's employment. Appellants' argument suggests that permitting reopening in this case subverts the purpose of the last injurious exposure rule. The subsequent exposures, however, present an entirely separate issue. The last injurious exposure rule assigns liability to the employer who last injuriously exposed the claimant *prior to the onset* of the disease, not prior to any exacerbation of the disease. *Waskiewicz v. GMC*, 342 Md. 699, 707–08 n. 6, 679 A.2d 1094 (1996) (adopting reasoning of *CES Card*, 104 Md.App. at 314, 656 A.2d 332). Thus, had the subsequent exposures to repetitive trauma caused a progression of appellee's carpal tunnel syndrome rather than a development of cubital tunnel syndrome, Luby still would be liable, irrespective of the subsequent exposures. We do not see why the development of a new disease, if it is causally related to the initial disease, should be treated differently in this regard.

Our review of the historical treatment, by the legislature and the courts of Maryland, of "accidental injury" and "occupational disease" convinces us that, in the absence of express legislative direction to the contrary, ordinary common law tort principles are applicable. *See Belcher*, 329 Md. at 722, 621 A.2d 872 ("In the absence of a textually demonstrable legislative intent to exclude from compensability those accidental injuries that result in mental harm alone and in the lack of a definitive answer in our Worker's Compensation cases, we turn to tort cases.")

When we apply those principles we see that causation is the proper test for determining the extent of a claimant's injuries that are compensable under a single claim for occupational disease. *Adams v. Benson*, 208 Md. 261, 270–71, 117 A.2d 881 (1955); *Aeropesca Ltd. v. Butler Aviation International, Inc.*, 44 Md.App. 610, 630, 411 A.2d 1055, *cert. denied*, 287 Md. 749 (1980). More specifically, "in cases sounding in tort, a tortfeasor is liable for any injury which is the direct, natural and probable consequence of his wrongdoing." *Aeropesca*, 44 Md.App. at 630, 411 A.2d 1055. In a worker's compensation

case, there is, of course, no wrongdoing from which all else flows. In a worker's compensation case involving occupational disease, it is the development of the occupational disease, including disablement therefrom, that creates the entitlement to compensation under the Act. Since the development of occupational disease is the pivotal event, everything which is the direct, natural and probable consequence of the occupational disease is compensable. Applying these principles, we hold that appellee may reopen her carpal tunnel claim if her cubital tunnel syndrome developed as a direct, natural and probable consequence of her carpal tunnel syndrome. In so holding we treat occupational disease the same as accidental injury is expressly treated by the Act, with one qualification. *See* § 9–101(b); *Dickson,* 146 Md. at 578–79, 126 A. 907. That qualification is embodied in § 9–608.

Section 9–608 section provides as follows:

(a) *Determination of percentage of contribution.*—The Commission shall determine the percentage that an occupational disease contributed to the death or disability of a covered employee when:

(1) the occupational disease is aggravated by another disease or infirmity that is not compensable; or

(2) the occupational disease accelerates, aggravates, prolongs, or in any way contributes to a disability or death from a cause that is not compensable.

(b) *Reduction of compensation.*—(1) The compensation payable shall be reduced to the percentage of the compensation that equals the percentage that the occupational disease contributed to the death or disability, as determined by the Commission under subsection (a) of this section.

(2) As may be in the best interest of the covered employee under the circumstances of the case, the Commission shall reduce the compensation to the percentage required by paragraph (1) of this section by reducing:

(i) the number of weekly or monthly payments; or

(ii) the amount of the payments.

Thus, in an appropriate case, the Commission will adjust an award to reflect the proportion of a disability or death that is proximately caused by an occupational disease as distinguished from another non-employment related cause.

In this case, the issue of whether appellee's cubital tunnel syndrome was causally related to her carpal tunnel syndrome was submitted to the jury. Appellants did not object to the trial court's instructions to the jury, and the correctness of such instructions is not before us. Similarly, the sufficiency of the evidence regarding causation is not raised by appellants, and we presume that such evidence was sufficient to support the jury's verdict in favor of appellee.

Given our disposition of appellants' first question, appellants' questions two and three require little discussion. Both questions are predicated on the treatment of appellee's carpal tunnel syndrome and cubital tunnel syndrome as two distinct claims. While it is true that appellee must sustain an actual disablement in order to receive medical treatment under the Act, she already has sustained such disablement by virtue of the carpal tunnel syndrome that formed the basis of her initial claim. Neither § 9–660 nor § 9–736 require an additional episode of disablement for the reopening of a claim for additional medical benefits. Similarly, appellants cannot prevail on their third question. Given our holding that the cubital tunnel syndrome constituted a worsening of appellee's condition, rather than a basis for a new claim, Luby is the liable employer under the last injurious exposure rule; Luby was the employer who last injuriously exposed appellee to repetitive stress prior to the onset of appellee's carpal tunnel syndrome. *See CES Card,* 104 Md.App. at 314, 656 A.2d 332.

Our holding is based on the facts of this case and the manner that the issues were presented to us. This case should not be read to preclude an employer from arguing the issue of causation, if suggested by the facts, or from impleading a subsequent employer, if the subsequent disease is itself compensable or if it is otherwise warranted by the facts. It is for the Commission to determine, in the first instance, as

directed by the legislature, whether the reopening of any particular claim is justified.

JUDGMENTS AFFIRMED; APPELLANTS TO PAY THE COSTS.