847 A.2d 493

**KEYSTONE MASONRY CORP., et al.**

v.

**Elvis Rudis HERNANDEZ (deceased).**

No. 680, Sept. Term, 2003.

Court of Special Appeals of Maryland.

April 19, 2004.

498

Douglas A. Seymour (Siciliano, Ellis, Dyer & Boccarosse, on brief), Fairfax, VA, for appellant.

David Pawlik, Washington, DC, for appellee.

Argued before HOLLANDER, SONNER and SHARER, JJ.

SHARER, J.

The issue in this workers' compensation case, involving the death of a worker, is dependency. Appellants, the deceased's employer, Keystone Masonry Corporation, and its insurer, Montgomery Mutual Insurance Company,[1] seek review of a judgment of the Circuit Court for Prince George's County, entered pursuant to a jury verdict, finding that the deceased's three minor children were wholly dependent upon him for

---

1. For clarity, we shall refer to the employer and insurer collectively as "employer."

support when he died, and were thereby entitled to death benefits pursuant to Md. Ann.Code (1999 Rep. Vol.), Labor and Employment Article § 9–681(g).

One question is presented for our review, which, restated, is:

Was the evidence sufficient to support the jury's verdict that the deceased's three children were wholly dependent upon him at the time of his death?

We answer the question "yes" and shall affirm.

## FACTUAL and PROCEDURAL BACKGROUND

At the time Elvis Rudis Hernandez, a citizen of El Salvador, arrived in the United States on March 16, 1999, he was the father of two children, Katherine Nataly, born August 5, 1996, and Kevin Alexis, born April 21, 1998. After his death, a third child, Elvis Rudis (called "Rudito" by his family), was born on June 29, 1999. The parties stipulated that Hernandez was the father of all three children. The children remained in El Salvador with their mothers, Iselda Salmeron (the mother of Katherine) and Glenda Romero (the mother Kevin and Rudito) while Hernandez worked in this country.[2]

Hernandez found work as a laborer at Keystone Masonry Corporation, located in Beltsville, Maryland. He began his employment on March 30, 1999, just two weeks after arriving in the U.S. On May 24, 1999, while in the employ of Keystone, Hernandez was killed when a wall collapsed on him.

### Workers' Compensation Commission Proceedings

On February 9, 2000, a claim for death benefits was filed on behalf of the three children, pursuant to Lab. & Empl. § 9–501(a)(2). Keystone contested only whether the children were wholly dependent upon their father at the time of his death.[3]

---

2. Hernandez was never married to either Iselda Salmeron or Glenda Romero.

3. At oral argument, appellants conceded that Katherine and Kevin are, at least, partially dependent. They further posit that Rudito, not born at the time of his father's death, does not qualify as a dependent.

To support their claim of dependency, appellees point out that Hernandez sent funds to them from his earnings at Keystone through an informal courier system commonly used by El Salvadoran immigrants.

A hearing was held before the Commission on April 29, 2002. Oscar Romero Florez, a courier who traveled to El Salvador on a relatively regular basis to deliver money (and other items) from U.S. workers to their families there, testified that he had taken a total of $750 in U.S. currency to El Salvador for the Hernandez children on two separate occasions. Florez told the Commission that, each time, he delivered $75 to Salmeron and $250 to Romero. Florez testified that his first trip on Hernandez' behalf was in March 1999, before Hernandez began working for appellant, and the second was on May 24, 1999, coincidentally the date of Hernandez' death.

Hernandez' father, Fredis Hernandez, who also resided and worked in the U.S., testified that his son sent money to El Salvador, which was delivered to his (the elder Hernandez') wife. He conceded that he never personally witnessed Florez deliver the funds, as he and his son remained in this country. Fredis Hernandez testified that Iselda Salmeron and Katherine lived with family in San Salvador, and that Glenda Romero, then pregnant with Rudito, and Kevin lived in a small home on the Hernandez property in El Salvador.

On May 17, 2003, the Commission ruled that the Hernandez children, in El Salvador, were not dependent upon their father and denied their claim for death benefits. The children petitioned for judicial review and requested a jury trial.

*Circuit Court Proceedings*

At trial on May 14, 2003, appellees presented the testimony of Dr. Manuel Orozco, Fredis Hernandez, Oscar Florez, and Dorothea Hernandez (the deceased's mother). Because the sole issue before us is sufficiency of the evidence, we shall review the testimony of each witness.

502

### Manuel Orozco

Dr. Orozco is affiliated with the Inter–American Dialogue and Center for Policy Analysis, a research institute that analyzes economic, political, and social issues in Latin America. He was qualified as an expert on the subjects of family remittances and the economy of El Salvador.

Dr. Orozco, who himself travels frequently to Central America, testified about a method commonly used by immigrant workers to send money from this country to El Salvador:

> The process that takes place is basically two-fold. You either send the money through an existing institution like Western Union, for example, or sometimes you use informal mechanisms like you look for a friend, a family person or more common an interpreter that does the business of taking the money for you, and sometimes these are called travelers. They travel sometimes twice a month back to these countries, and they carry with them sometimes $20,000 or something like that in cash and then they deliver it in the home country.

> The relative receives the money and they send it for basically to cover basic needs, food, clothing, housing and sometimes other elements.

Dr. Orozco told the jury that many immigrants chose to utilize the more informal "traveler" system because wire transfer of funds was more expensive, and because many El Salvadorans do not have access to banks. He also opined that the amount of money sent by Hernandez before his death, $750, would have been sufficient to support three people in El Salvador for one month.

### Fredis Hernandez

Fredis Hernandez testified that he saw his son give money and letters to Florez for delivery to Hernandez' children in El Salvador. On cross-examination, the elder Hernandez testified that he also sent money by courier to his wife, who was then living in El Salvador.

Hernandez acknowledged that Glenda Romero also had family in New York, who may have sent small amounts of money to El Salvador, and, likewise, that Iselda Salmeron had family in Connecticut, who may have sent small amounts of money to her on occasion. He also testified that his daughter, also working in the U.S., occasionally sent her niece and nephews ten dollars, and that the family received no assistance from El Salvador's government. Hernandez confirmed that Katherine lived with Iselda Salmeron and Salmeron's sister at the time of his son's death.

### Oscar Romero Florez

Florez testified that he had delivered $250 to Dorothea Hernandez on three separate occasions in 1999 while Hernandez was living and working in the U.S. He testified that, in addition to money, he carried letters, clothing, and shoes to El Salvador for the Hernandez children from their father. He specified the dates of his travel as April 19, 1999; May 9, 1999; and May 24, 1999.

Fredis Hernandez and Florez both testified at trial that they were not provided with Spanish–English interpreters at the Commission hearing, and had difficulty expressing themselves.

### Dorothea Hernandez

At the time of her son's death, Dorothea Hernandez was living in El Salvador, although she later came to this country. She testified at trial that she had cared for Kevin while his mother shopped for food, clothing, and medicine, with the money sent to them by Hernandez. She testified that Glenda Romero was not employed and that she was unaware of any other source of income, other than Hernandez' contributions, for the support of Kevin or his unborn brother. Mrs. Hernandez confirmed that the courier would deliver the money to her home and that Iselda Salmeron would come there to receive it. She was uncertain whether Iselda Salmeron had a job, or any other source of income. Mrs. Hernandez also testified that Iselda Salmeron's father told her that Iselda purchased medi-

cine, clothing, shoes, and food with the money sent by Hernandez.

## The Verdict

After brief deliberations, the jury found that all three children were wholly dependent upon their father. The circuit court entered a judgment and an order on May 14, 2003, remanding the matter to the Commission for further proceedings consistent with the verdict and judgment. A timely appeal followed.

## STANDARD of REVIEW

Our review of this matter is governed by § 9–745 of the Labor and Employment article of the Maryland Code, which states in pertinent part:

(b) *Presumption and burden of proof.*—In each court proceeding under this title:

(1) the decision of the Commission is presumed to be prima facie correct; and

(2) the party challenging the decision as the burden of proof.

Md.Code, Lab. & Empl. § 9–745(b) (1999 Repl.Vol.). The same section also states, however, that:

(d) *Request for jury trial.*—On a motion of any party filed with the clerk of court in accordance with the practice in civil cases, the court shall submit to a jury any question of fact involved in the case.

Lab. & Empl. § 9–745(d). This Court has held that this provision ensures an essentially *de novo* trial in the circuit court. *General Motors Corp. v. Bark,* 79 Md.App. 68, 79, 555 A.2d 542 (1989) (citing *Maryland Bureau of Mines v. Powers,* 258 Md. 379, 382, 265 A.2d 860 (1970)). *Accord Livering v. Richardson's Rest.,* 374 Md. 566, 573, 823 A.2d 687 (2003). In so doing, the Court attempted to reconcile the two provisions of § 9–745:

If the claimant loses before the Commission and then appeals to the circuit court, [§ 9–745(b) ], as a practical

matter, is largely meaningless. The claimant has the burden of producing a *prima facie* case before the trial court, lest he suffer a directed verdict against him, just as he, as the original proponent, had the same burden before the Commission. The only difference is that the record made before the Commission will normally satisfy the claimant/appellant's burden of production at that circuit court level. The claimant has, moreover, the same burden to persuade the trial court by a preponderance of the evidence that his claim is just as he had to persuade the Commission in the first instance.

*General Motors Corp., supra,* 79 Md.App. at 79–80, 555 A.2d 542. More recently, this Court has stated:

A trial that is essentially *de novo* is unlike the procedure applicable to many other administrative law bodies, where appeal to the circuit court is usually determined on the record made at the agency hearing. *General Motors Corp. v. Bark,* 79 Md.App. 68, 88–89, 555 A.2d 542 (1989). At trial, the parties may rely on the same or different evidence than was presented to the Commission. *Id.* at 81, 555 A.2d 542. At the same time, the Commission's decision is not treated as if it had never occurred. "It is, rather, the case that the presumptively correct outcome of that adjudication is admissible as an item of evidence and is the proper subject of a jury instruction." *S.B. Thomas, Inc.,* 114 Md.App. at 366, 689 A.2d 1301 (citing *Holman v. Kelly Catering, Inc.,* 334 Md. 480, 486–87, 639 A.2d 701 (1994)).

The Court of Appeals long ago described the appellate court's standard of review of these essentially *de novo* trials: *Talley v. Dept. of Correction,* 230 Md. 22, 29, 185 A.2d 352 (1962).

*Applied Indus. Techns. v. Ludemann,* 148 Md.App. 272, 282–83, 811 A.2d 845 (2002).

■ As one author has interpreted the statute, "[t]he jury or the judge, as the case may be, is free to interpret the facts as if the Commission had not previously determined them. If the jury's mind is in a state of equipoise, then the Commis-

sion's decision should be affirmed." Richard P. Gilbert & Robert L. Humphreys, Jr., MARYLAND WORKERS' COMPENSATION HANDBOOK at 314 (1988).

 Section 9–750 provides for appeal to this Court "as provided for other civil cases." Lab. & Empl. § 9–750. Thus:

> The verdict of a jury on a question of fact is conclusive on appeal. *Fowler v. Benton,* 245 Md. 540, 545, 226 A.2d 556, *cert. denied,* 389 U.S. 851, 88 S.Ct. 42, 19 L.Ed.2d 119 (1967). It is not our function to inquire into the weight of the evidence, rather, we determine only whether there was legally sufficient evidence to support the jury verdict. *Temoney v. State,* 290 Md. 251, 261–62, 429 A.2d 1018 (1981); *Gray v. Director, Patuxent Inst.,* 245 Md. 80, 84, 224 A.2d 879 (1966).

*Fraidin v. Weitzman,* 93 Md.App. 168, 193–94, 611 A.2d 1046 (1992). This Court has reiterated the test for sufficiency of the evidence: "In any case, civil or criminal, to meet the test of legal sufficiency, evidence (if believed) must either show directly, or support a rational inference of, the fact to be proved." *Starke v. Starke,* 134 Md.App. 663, 679, 761 A.2d 355 (2000) (quoting *Edwards v. State,* 198 Md. 132, 157–58, 81 A.2d 631 (1951)).

## DISCUSSION

Appellants make separate arguments with respect to the dependency of each child.

### Katherine and Kevin

With respect to Kevin and Katherine, appellants assert, "it is clear from the testimony of both Mr. and Mrs. Hernandez [senior], that they gave substantial aid to their son and [that] both of the mothers of his three children also received substantial financial assistance and assistance in kind from their own relatives prior to the time of the claimant's death."

 We agree with appellee's argument that the evidence presented at trial, and recounted above, is legally sufficient to support the jury's verdict.

■ In support of their argument of insufficiency of the evidence, appellants suggest that the absence of written records of the transactions between Florez and Hernandez was a fatal flaw in claimants' proof. The record, however, supports a reasonable inference that recordkeeping was not a common practice. Fredis and Dorothea Hernandez and Florez all testified without contradiction[4] as to the amount and frequency of the transactions and the method of delivery. Dr. Orozco testified that the method utilized by Hernandez is common among immigrant workers, and that the funds were often delivered in cash. It is apparent that the jury judged the witnesses to be credible on this issue.

Appellants next argue that the contributions by the senior Hernandez' and other extended family should limit the childrens' right to benefits to, at most, partial dependency. Whether Mr. and Mrs. Hernandez, or others, provided "substantial aid" that would have made the children less than wholly dependent, as argued by appellants, was a factual determination for the jury to make. Although appellants argue that the record indicates both of the mothers received substantial financial assistance, and assistance in kind, from other family members, there was sufficient evidence presented at trial to support the opposite conclusion. The jury resolved the factual conflict by determining that the family contributions were insufficient to render the children less than wholly dependent.

Fredis Hernandez testified that, while he worked in this country and his wife remained in El Salvador, he sent money to her, and that she *could* have given some of her own money to support Glenda Romero or Iselda Salmeron. When asked whether Glenda Romero's family sent her money, he responded "[n]ot exactly to help her. They could have sent her a little bit, but not to help." As we have noted, Hernandez also testified that he was uncertain whether Iselda Salmeron's relatives living in Connecticut sent her money, or whether his

---

4. Appellants offered no testimonial evidence at trial.

daughter, Maritza, may have sent small sums each month to El Salvador for her niece and nephews. And, we are reminded, Hernandez was married to neither of the mothers of his children; hence, no claim was made in their behalf and only the children could have qualified as dependents.

Dorothea Hernandez' testimony that she personally handed money to Glenda Romero and Iselda Salmeron, received from her son, for their children; that she cared for her grandchild while Glenda Romero shopped for the child; that Romero was not employed; and that she was unsure whether anyone else provided any support, was probative on the question of dependency. The evidence would allow the jury to accept that version. Likewise, her testimony that Iselda Salmeron was unemployed during the period in question, and that she was unsure whether others were providing her with support, was apparently convincing to the jurors.

She conceded, on cross-examination, that Iselda Salmeron's sister and father were "help[ing] her out," and "support[ing] her." She testified that she was unsure whether Iselda Salmeron's relatives in this country sent her any money. Mrs. Hernandez testified that Glenda Romero continued to live on the Hernandez family property while her son worked in this country. She also testified, forcefully, that none of the money sent from Fredis Hernandez was for the support of the children, or their mothers.

The testimony, recounted above, viewed in the light most favorable to appellees, is sufficient to support the jury's findings that the children then in being were wholly dependent upon Hernandez for support. In determining whether the children were wholly dependent upon their father, they must not have had *consequential* sources of income or support other than that provided by him. *Bituminous Const. Co. v. Lewis,* 253 Md. 1, 3, 251 A.2d 888 (1969).

Stated alternatively, the Court of Appeals said, in *Johnson v. Cole,* 245 Md. 515, 520–21, 226 A.2d 268 (1967),

A claimant need not, however, show destitution in order to obtain an award as a total dependent. He may receive

temporary gratuitous services, occasional financial assistance or other minor benefits from sources other than a deceased workman, but he must not have had a consequential source or means of maintenance in addition to what is received out of the earnings of the deceased. *Larkin v. Smith,* 183 Md. 274, 37 A.2d 340 (1944). In other words, compensation should not be denied a claimant as a total dependent merely because of occasional financial aid received by him from other sources or other benefits which do not substantially affect or modify his status toward the deceased employee. *Superior Builders, Inc. v. Brown,* 208 Md. 539, 119 A.2d 376 (1956).

The uncontroverted testimony at trial is that neither Iselda Salmeron nor Glenda Romero had alternative sources of income, other than housing assistance provided by family, or "occasional financial assistance or other minor benefits from sources other than . . ." Hernandez. That evidence supports the inference that the support provided by him was sufficient for the jury to find Katherine and Kevin to have been wholly dependent.

### *Rudito—the Unborn Child*

██ With respect to Rudito, who was unborn when Hernandez died, appellant argues that it was impossible for a jury to find he was wholly dependent upon Hernandez because "[n]o evidence was presented that any of the money given to his mother went to his care." We take appellants' argument to be that, because Rudito was unborn when his father died, he could not have been dependent upon Hernandez. We find that position to be without merit.

Dependency is a creation of statute and an expression of public policy by the General Assembly. Thus, for a determination of who is to be considered a dependent, we look first to the statute. Md.Code Ann., Lab. & Empl. § 9–101(c)(3) provides

### § 9–101. Definitions.

(a) *In general*—In this title the following words have the meanings indicated.

\* \* \*

(c) *Child.*—"Child" includes:

(3) a posthumous child; . . .

■ A posthumous child is one born after the death of its father. BLACK'S LAW DICTIONARY, 233 (7th ed.1999). Thus, it is beyond dispute that Rudito is a posthumous child for the purpose of the Maryland Workers' Compensation Act.

Section 9–681 provides that wholly dependent individuals of a covered deceased employee are entitled to certain benefits, and defines those benefits. Among those who are entitled to file a claim is a child who remains wholly dependent upon the deceased covered worker. Lab. & Empl. § 9–681(g). Reading § 9–101(c)(3) and § 9–681(g) in concert, we come to the inescapable conclusion that Rudito is a child who is entitled to file a claim for dependency benefits.

Our conclusion as to his standing is without benefit of a precise holding by either this Court or the Court of Appeals. Hence, the limited issue of the total dependency of a posthumous child is one of first impression.

The question of entitlement of a posthumous child to dependency status was considered in *Redfern v. Holtite Mfg. Co.*, 209 Md. 106, 120 A.2d 370 (1956), the facts in which are not dissimilar to those here presented. Redfern died as a result of a compensable industrial accident. He was survived by his mother, his wife, and a woman with whom he lived. Approximately seven months after his death, the latter gave birth to his illegitimate child. Claims of dependency were filed by his mother, his wife, his paramour, and his posthumous child.

After a review of the history of workers' compensation law as it relates to dependency, the Court assumed, "without deciding, that the posthumous, illegitimate child in the instant case would have been entitled to compensation . . ." *Id.* at 110, 120 A.2d 370. That phrase is clearly dicta, for the Court proceeded to decide the case on the grounds of limitations,

affirming both the Commission and the circuit court on that issue.

The rights of posthumous children have been recognized in other contexts, as was elaborately pointed out in *Damasiewicz v. Gorsuch,* 197 Md. 417, 79 A.2d 550 (1951), a motor tort case concerning injuries to an unborn child. In an exhaustive opinion reviewing the authorities from "... the Seventh Part of the Reports of Sir Edward Coke, published in 1738, [containing] ... the Earl of Bedford's case, Michaelmas Term (1586), 28 and 29 Elizabeth" to date, Judge Marbury developed the history of the subject of the rights of a child who suffers prenatal injuries. Concluding that the trial court's grant of summary judgment to the defendant, on the ground that the unborn child had no right of recovery, was in error, the Court said:

> If a child is to be considered a part of its mother until birth, then the mother should be able to recover damages for injury to this part of her as well as for injuries to other parts. Yet there seems to be no case allowing such recovery.
>
> \* \* \*
>
> If neither the child nor the mother can recover, then we have a serious case of *damnum absque injuria.*
>
> \* \* \*

The only logical basis for denying recovery by a child for an injury while *en ventre sa mere* is that stated by Justice Holmes. He based it upon a common law which had no positive existence, but is derived from an isolated statement by Lord Coke, which is itself modified in the same sentence by the suggestion that the law in many cases has consideration for the unborn child by reason of the expectation of its birth. The will and inheritance cases recognize the right of an unborn child, and so do the criminal cases. His right to claim damages in admiralty is established. All of these may be under adaptation of the civil law to the common law, but when incorporated in it, they become part of the common law. If we are considering a case of first impression

anywhere, we would be unable to find that the common law denied the right. On the contrary, it would appear that, in so far as there was any common law on the subject, the right would be recognized under the general theory, *ubi jus ibi remedium* [where there is a right, there is a remedy].

It is *our* duty to determine what is the common law applicable to the circumstances and condition of Maryland. *Gilbert v. Findlay College,* 195 Md. 508, 74 A.2d 36. We have not hesitated to differ with the majority rule in other cases where we found it to be wrong. *Mahnke v. Moore,* 197 Md. 61, 77 A.2d 923. In view of the confused state of the law elsewhere, and the practically unanimous criticism of the majority cases by writers on the subject, and in view of the numerous dissenting opinions in these cases, we cannot regard them as compelling authority. When we examine the reasons behind them, we find them based upon an outworn point of view, now rejected by modern medicine, and rejected by the later cases. We think the modern view is the correct one, and, since there has heretofore been no occasion to decide what is our common law and we must for the first time decide it now, we think our decision should be made on the basis of present day knowledge. To hold otherwise would be a step backward, and would substitute a plebiscite of states for reason.

Such a holding does not usurp the legislative function, because we are determining now what the common law of Maryland always has been. If the question had been raised at the end of the 18th Century, it might have been decided differently, but if it had been so decided this would have been because of an ignorance of medical facts which are now common knowledge. The common law does not depend upon the knowledge of facts, although such knowledge, or the lack of it, may result in different interpretations at different times. The law itself deals with rights, and since we now know that a child does not continue until birth to be a part of its mother, it must follow that as soon as it becomes alive it has rights which it can exercise. When it becomes alive is a medical question to be determined in each

case according to the facts. Just because this is the first time for 175 years that the question has arisen in this court, does not make our conclusion judicial legislation.

*Damasiewicz, supra,* 197 Md. at 439–41, 79 A.2d 550.

We are also reminded of the required liberal construction of workers' compensation law in favor of the injured worker. *Ferretto v. Subsequent Injury Fund,* 53 Md.App. 514, 454 A.2d 866 (1983). We said in *Tortuga, Inc. v. Wolfensberger,* 97 Md.App. 79, 627 A.2d 56 (1993):

> The avowed purpose of the Workers' Compensation Act is remedial in nature. It was designed to "provide compensation for loss of earning capacity resulting from accidental injuries sustained in industrial employment." *Cox v. American Store Equip. Corp.,* 283 F.Supp. 390 (D.Md.1968). In addition, the case law has held that, where an ambiguity in the law exists, "the uncertainty should be resolved in favor of the claimant." *Cline v. Mayor and City of Baltimore,* 13 Md.App. 337, 344, 283 A.2d 188, *aff'd* 266 Md. 42, 291 A.2d 464 (1972).

*Id.* at 83, 627 A.2d 56.

Thus, absent a statutory prohibition, the tenet of liberal construction, taken together with the law requiring resolution of uncertainty in favor of the injured worker, would, alone, justify our finding that Rudito was a member of a class who, upon adequate proof, would be entitled to dependency benefits.

We hold, therefore, that a child, born after his parent's death in a compensable industrial accident, as was Rudito, may be found to be wholly dependent upon that parent. In this case, a permissible inference from the evidence is that essentially all of the children's support came from their father. All three children, including Rudito, are entitled to dependency benefits.

### Housing

Finally, appellants argue that because Hernandez did not directly provide housing for his children, they could not be

wholly dependent upon him. Kevin and Glenda Romero, while pregnant with Rudito, lived on the senior Hernandezes' property in a casita, where she had lived with Hernandez before he left El Salvador for the U.S. Iselda Salmeron had lived with Hernandez in that same place, until she left to live with her family in San Salvador.

Appellees assert that, in the case of Glenda Romero, it was reasonable for the jury to infer that the senior Hernandezes had provided the casita to their son and, were it not for Glenda Romero and Kevin's relationship with him, they would not have been welcome to remain. It could be thus concluded that both Kevin and Rudito were dependent on the good will of their father, *vis a vis* his parents, for that shelter.

As to Iselda Salmeron's housing, the evidence reveals that she and Katherine lived in San Salvador with her sister, who operated a grocery store. On cross-examination, Fredis Hernandez testified that Iselda Salmeron "helped her sister" in the store. There was no testimony concerning the amount of rent, if any, that was paid for lodging. Nor was there other evidence of a financial relationship between the sisters.

Notwithstanding the evidence on the question of housing, from which the jury clearly made findings, the issue is without merit. The Court of Appeals has ruled that total dependency can be found, even where shelter is not provided by the deceased worker:

As far as the furnishing of shelter is concerned this Court has indicated that total dependency could be found even though the housing of the claimant was not supplied by the deceased. In *Larkin v. Smith, supra,* although the claimant lived in a house owned by herself and her uncle and had some income from the sale of eggs, the jury was entitled to consider whether she was totally dependent upon the deceased, her son, who had contributed about $18.00 a week to her support. A more analogous case is *Wash. Sub. San. Com. v. O'Donnell,* 208 Md. 370, 118 A.2d 674, where this Court affirmed a finding that a son was totally dependent upon his father even though his mother had a partial

interest in the family's house. See *Knibb v. Jackson,* 210 Md. 292, 123 A.2d 338.

*Bituminous Constr. Co., supra,* 253 Md. at 4, 251 A.2d 888.

In that case, the claimant lived with his grandparents. After his grandfather died, he sought benefits on the grounds that he was wholly dependent upon the deceased. The Court held that the jury could find the claimant to be wholly dependent, even though his grandmother, not his deceased grandfather, paid the mortgage on the family home. *Id.* Thus, the jury in the instant case could have found that Katherine was wholly dependent upon Hernandez, notwithstanding that other family members may have provided housing for her.

The record supports a finding that the evidence was sufficient for the jury to find that all three children were wholly dependent upon their father. We affirm the judgment of the circuit court.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED;**

**COSTS TO BE PAID BY APPELLANTS.**